Hi, I'm Allison Dixon. I represent Petitioner Ramnarine in this matter. Speak up. I'm Allison Dixon. I represent Petitioner Ramnarine in this matter. The main issue that appears to be at issue in this case is whether or whether or not the government of Guyana is able to control. I'll tell you something. This is a beautiful room, but the acoustics are terrible. Shall I speak closer? Is this? A little louder. How about this? Okay. What seems to be the main issue in this case is whether or whether or not the government of Guyana is able to control the members of the People National Congress, known as PNC. In this country, the population is almost evenly divided between people of Indian and African ethnicity. They have two main parties, the PNC I mentioned and the People's Progressive Party. Those parties represent primarily along the ethnic lines. So PNC is primarily Afro-Guyanese and PPP is primarily Indian-Guyanese. The board in its decision found that the government was able to control the PNC based on the Department of State reports, showing that they had made attempts to recruit the Indian population more into the police and military. Might I just back off for a minute? Don't we have any technical assistance with this? What? The best we can do to cut our budget drastically. Is this better? Yeah. Okay. The population is pretty much evenly divided between people of African and Indian ancestry. The main political parties are also divided so. The PPP is currently control of the government. However, the majority of the police and military are still run by PNC members. This is documented in the Department of State report. May I ask a question? When these events happened to your client, was the PNC, the Afro-Guyanese party, was it in control of the government? No, Your Honor. The PPP was in control. How long have they been in control of government? I believe they've been in control since 1997. Was the State Department country report in evidence? Yes. And what does it say about, did it say at the moment of the hearing about current country conditions? What it said at the moment of the hearing is that the government had a very poor human rights record, that police abuses were rather rampant, that the government had taken some steps to investigate, had made some charges, but that in general the police acted with impunity. It also stated that the police and the military are overwhelmingly from the PNC party. It also stated that while the government attempted to recruit more of the Indian ethnicity groups into the military and police, that those efforts had failed. What it said that the board used to support the decision saying that the Guyanese government could control PNC was that the attempted recruitment and the fact that they had set up various discussion boards to try and ease the racial tensions. But it's our contention that the Department of State report shows merely that the government is attempting to control, but is not yet able to do so. And that was also backed up by respondents' testimony that when he attended political rallies, he was approached by members of the PNC, told to leave on the first occasion. When he says he will not leave, he wants to hear the speeches, that's when he gets attacked by the PNC. When he attends a second rally within the same week, he's again approached by the same members of the PNC. They recognize him, they say, we told you not to come to these rallies, we told you not to support the PPP. He says, I intend to stay. They then put a knife to his throat. Again later, when he's at a restaurant, he also is singled out by the PNC. They come to him, stop his bite by putting a stick in the spokes, say, now are you ready to help us recruit Indians into our party? When he refuses to answer, they again attack him. And this all occurred while PPP was in control of the government. And these actions, coupled with the Department of State report, we feel show that the government, while it may be attempting and it may be willing to try to control, is not yet able to control at this time. And again, we say that the Department of State report basically backs up our position, because it does state that the police, who are primarily PNC, operate with impunity, and that the government has only made small steps in terms of investigating or charging people to prevent this activity by the police. What was this country called before it was called Guyana? It was called British Guyana. British Guyana. Correct. There's apparently a French and a British Guyana. There was a French Guyana, a British Guyana, and a Dutch Guyana. Dutch Guyana, I think, is now called Suriname. Suriname. What's the French Guyana called? I believe it's still called French Guyana. That's where Devil's Island was. I believe so, yes. Yes. Do you want to save some time? Yes, Your Honor. Good morning.  The record before this Court does not compel the conclusion that Petitioner is entitled to discretionary granting of asylum. The decision of the Board finding Petitioner ineligible for asylum and withholding of removal should not be disturbed. In this case, in all asylum cases, Petitioner has a burden to show that he is eligible for asylum. Petitioner must show that he was persecuted on account of a protected ground and that the Guyanese government is unable or unwilling to control civilian PNC supporters. Any doubt but that he was beaten, as he described? There's no doubt that he was beaten, Your Honor. The Board did not. Any doubt that it was by people espousing a different political point of view? There's no doubt on the record, Your Honor. And that it was on account of his differing political point of view? It was on account of him attending a political rally, Your Honor. Well, what else do you need? But the Board did not reach, in this case the Board did not reach the decision of whether or not the acts that he was a part of constitute past persecution. The Board looked at simply whether or not the government of Guyana is unwilling or unable to control the civilian PNC supporters. And once it determined that the government is willing and able to control. What was the proof of that? Your Honor, I think the country reports show that the government of Guyana is taking steps to resolve this racial tension that's been going on in the country for 40 or 50 years. That sounds a little bit like a Department of Education report about the southern United States in 1956, saying that the school districts are taking steps to desegregate. In 1956, there were no desegregated schools in the south. What evidence is there that they were actually having any effect? And doesn't the country report saying that they're trying, admit that it's sporadically successful? Your Honor, the evidence on the record here that supports the government's conclusion is actually Petitioner's own testimony. Petitioner says he didn't go to the police because he didn't think they would help him because the majority of the police are Afro-Guyanese. He bases his determination on the fact that he had a voice. Not just the majority. Wasn't it almost 100 percent? At one point, it was 90 percent. The government is taking steps to recruit more Indo-Guyanese into the police force. It's not in the record whether or not that recruitment effort is successful. We have a country report at the time of the hearing shows that it was an ongoing process. But if you look at Petitioner's testimony, particularly on the record on page 142, he describes this incident where he comes from. Wasn't there testimony that that recruiting effort was not successful? That's Petitioner's testimony, Your Honor. Okay. That's in the record, isn't it? Correct, Your Honor. But also it's in the record. He was found to be credible, wasn't he? He was. He was. But what's in the record here, based on his credible testimony, on page 142 of the administrative record, Petitioner describes an event where he was driving in the taxi cab and came across a roadblock that was set up by PNC supporters where he was, again, beaten by them, had some money stolen from them. But what he says in his testimony is that the police were there and the police were fighting with the PNC reporters. The police were trying to break down this roadblock. And the police were actively engaged in breaking up this event that was going on. So to say that the government is unwilling, unable to control, I mean, I think there it shows that they are taking steps to, like I said, reduce the tension between the two opposing political parties. Well, was that before or after the party to which he belonged came into power? Your Honor, the party to which he belonged came into power in 97. This event, I believe, occurred after the most recent election in 2001. It's like Fiji, isn't it? I'm not familiar, Your Honor, with that. Fiji is a country where East Indians were brought in for labor a century or so ago, and gradually they increased in population to where they became a majority, and they won a couple of elections. But the military and the police are controlled and dominated by ethnic Fijians, and it strikes me as the same kind of situation. Again, Your Honor, in this particular record, yes, the police force and the military may be dominated by Afro-Guyanese, but the government is not sitting back and allowing these things to happen. The government is taking progressive steps and taking steps forward to quell this racial tension, and that's what we're looking at here is whether or not the government is getting involved and trying to stop these events. What evidence did the government present of changed country conditions? Your Honor, the issue of changed country conditions isn't before this Court right now because there was no finding of past persecution. The analysis by the board was stopped at the point where they determined that there was no showing that the government was unable or unwilling to control this. So any discussion or any determination regarding that? Well, I mean, if the government is willing and able to control this, what was the basis of that? Again, Your Honor, it was in the State Department report, the government's steps they've taken to alleviate the racial tension in the country, showing that the police in Guyana are taking steps to combat these issues. Is it the government's position that if we were to grant any form of relief, we should remand to the board to reach that, to address that issue? Yes, Your Honor, that would be appropriate in this case. I'm not asking you to concede that that should happen. But if we were to grant relief, the government's position, it ought to go back to the board to consider whether changed circumstance affects this. If this Court were to say that the government of Guyana is unwilling and unable to control the PNC supporters, then what would be appropriate would be for this Court to remand for the board first to reach a conclusion that the acts that were described in here constitute past persecution, and then continue the analysis of whether or not there's been a rebuttable presumption. There's an issue here as to whether he went to the police at all. That's correct, Your Honor. There's nothing in the record. In fact, Petitioner's own testimony indicates that he did not attempt to go to the police. And again, he did not say that it was because he felt his life was in danger. He just merely said because they're Afro-Guyanese, he didn't think they would help him out. And he tried to get some help from the police when his bike was stolen, and they couldn't find his bike. So that was the basis for his not going to the police. There's no further questions. I'm just curious if you know, these, the Indian people that were there, when were they brought there? I do not, unfortunately, Your Honor. What work do they do? The State Department country reports indicate that part of the problem with recruitment of Indo-Guyanese for the police department and for the military is that the Indo-Guyanese are focusing more towards business and other professions, and they're not doing the government service route. Yeah, but, you know, if you've got a police department and a military that's 90 or 95 percent, one group that's antagonistic to another group, you're not going to get too many people that are going to want to join that. You know, one by one. Maybe they'd all go together, like 50,000 of them, but you're not going to. Let's see how you're going to get one or two or three or four, recruit them over there. But a lot of these East Indians, and Fiji is, you know, a perfect example. They were brought there by the Fijians, not by the Fijians, but by the British and New Zealanders to work on the sugar cane industry, and they would get and still get, I think last time I was there, they'd get a dollar a day chopping sugar cane, and they got to bring their own machete. That's the work they do. Some of them are in business, but maybe that's one half of one percent. So it's a big problem.  Thank you. Thank you, Your Honor. On the issue of past persecution, we feel that Respondent's testimony, credible testimony, has in fact shown that he did suffer past persecution. He was attacked every time he went to a rally. He started attending the rallies as soon as he was eligible to vote. This election was best as a rally. So I could show she didn't then complain to police. That's correct. His testimony when he was asked why, first asked why he didn't go to the police, was that he felt that they would do him no help because they were primarily Afro-Guyanese. The testimony regarding the back- That was his view. That was his prediction. That's hardly a fact. Well, it is a fact that the police are overwhelmingly Afro-Guyanese who are PNC supporters. And he is, in fact, working for a party which is fighting the PNC for control of the government and the country. But all the cases we have where we have said that the government is unwilling and unable to control persecution by non-government groups have all involved situations where the petitioner has gone to the government and at least sought protection and been denied or rebuffed or ridiculed. The cases of the day, the law services Ashcroft, and there's a whole line of cases like that. I'm not remembering that I recall a case where somebody can say I didn't even bother going to police. I didn't try, but I can tell you if I did, they wouldn't have helped. There actually is a case. It's a matter of essay, board case 22, INN decision 1328, which stands for exactly that proposition. This was a case of a Muslim woman, I forget the country, who was more liberal than both her father and the prevailing social norms and did not go to the police because she felt that since they were, A, male and, B, more Muslim of the more strict variety, that they would not offer her help. And, in fact, the board found that her conclusion was substantiated by the Department of State report, which showed the facts as she stated, and I believe that this is analogous to the situation. What's the name of the case again? It's a matter of essay. It's actually quoted in not my brief, but in the government brief. How about writing it down on a gum sheet and giving it to the clerk? Absolutely. And I think the situation. It's on my second case. No, this is a board case. You don't have a Ninth Circuit case. I do not have a Ninth Circuit, no. And you didn't rely on this case in your brief. You didn't rely on this case in making your argument. No, I did not rely on essay in making my argument. Did you know about it? Yes. But we feel that this case is very analogous to what happened in essay because we have a similar situation where the police are overwhelmingly of the opposite party. Both parties are going after each other in very propagandistic wars. This is also supported in the Department of State, which says that both of the parties engaged in rhetorical and propaganda attacks that fueled racial tensions. He felt, and I think it was a genuine and objectively true feeling, that if he goes to the police, who are PNC, to complain that their party is preventing him from exercising his political rights with the PPP, that they would either not help him at all or, in fact, he may have inferred, although he doesn't say in a testimony, that they could harm him. But I think the government seems to cite a matter of essay for the exactly opposite proposition. They do. But if you read the case, you will see that the case does talk exactly about when it is not necessary to report to the police and ask for their help and be rebuffed to show that the government is not willing. And essay got relief? Yes. On this basis? Yes. And so, again, that's what we feel the situation is very analogous, and that the Department of State reports back-up petitioner's testimony that he would not have help from the police because they belong to the party that he's, in fact, opposing. Well, it's like, you know, the persecution of the Jews by the Nazis. A Jewish person is persecuted. Where are they going to go? Exactly, because the exact people that he would go to to report are, in fact, the people that were persecuting him, so it puts him in a very difficult position as far as getting police or government aid in this particular case. And the incident that was referred to by counsel of the roadblocks and the taxi, I feel that that also supports petitioner's position that the government is unable to control. After the elections in 2001, the country broke out in rioting, primarily by the PNC, because they were disappointed in having not taken back the government. Those riots, according to testimony, lasted for a month and were countrywide. This does not show that the government is able to control the population. In addition, when Mr. Romnerine was going to court, he had a court date with the immigration court in Guyana. The first time that he went to that court, the court was, in fact, postponed because the judge did not come, being afraid of his own personal safety during the rioting. It was when he went to the court the second time and the roadblocks were still up and the rioting was still going on that both he and his taxi driver were pulled from their car, given racial slurs or yelled at racial slurs, and were robbed. He then did proceed to the court. The rioting continued after this time. Now, he does say that the police were fighting the rioters, and that is true. But again, this shows that while they may be trying to control, they are currently unable to do so and were unable to do so at the time that my client applied for asylum in the United States. All right. Thanks a lot. That will stand submitted. And Singh v. Ashcroft, that's submitted. And well, that's Sarbjit Singh. Then Major Singh, that's submitted as well. And now we go to Cower v. Ashcroft.
judges: Pregerson, Kozinski, Hawkins